UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------X

The TOWN OF SOUTHOLD, the TOWN OF
SHELTER ISLAND, and CROSS SOUND
FERRY SERVICES, INC.,

                    Plaintiffs,

        -against-

The TOWN OF EAST HAMPTON,

                    Defendant.

-------------------------------------------------------X

04-cv-3860
(SJF)(WDW)

**OPINION & ORDER**

FEUERSTEIN, J.

I.      Introduction

This action was commenced by the Towns of Southold and Shelter Island (collectively, the "Town Plaintiffs") and Cross Sound Ferry Services, Inc. ("CSF") against the Town of East Hampton ("East Hampton" or "Defendant") seeking a declaration that Local Law No. 40 of 1997 of the Town of East Hampton (the "Ferry Law") is invalid. According to Plaintiffs, the Ferry Law violates the Dormant Commerce Clause and the Equal Protection Clause of the United States Constitution, and the Equal Protection Clause of the New York State Constitution. Plaintiffs also claim that the Ferry Law constitutes an improper and abusive exercise of East Hampton's police power under the laws and Constitution of New York. Defendant has moved for summary judgment on all counts. Plaintiffs have cross-moved for summary judgment on Counts One, Two and Four. Plaintiffs have further moved to strike Defendant's Rule 56.1 Statement. For the reasons set forth below, Defendant's motion for summary judgment is

granted and Plaintiffs' cross-motions for summary judgment and to strike Defendant's Rule 56.1 statement are denied.

II.    Background

Suffolk County (the "County") is the easternmost county on Long Island, separated from Connecticut on the north by Long Island Sound and bordered on the west by Nassau County.[1] Suffolk County consists of 1,000 sq. miles. It is 86 miles long, east to west, and at its widest and most westerly point is 26 miles, north to south. The County divides into two "forks" in the Town of Riverhead. The northern fork, (the "North Fork"), contains, <u>inter alia</u>, the plaintiff Town of Southold. The Town of Southold contains, <u>inter alia</u>, the Villages of Greenport and Orient Point.

The southern fork, (the "South Fork"), contains, <u>inter alia</u>, the defendant Town of East Hampton. East Hampton is, in turn, comprised of the Village of East Hampton, a portion of the Village of Sag Harbor and a number of unincorporated hamlets, including Montauk. East Hampton is 22 miles long and its width, north to south, ranges from 3/4 of a mile to 6 miles. The main east to west artery, Montauk Highway, provides one traffic lane in each direction. Plaintiff Town of Shelter Island is an island located between the North and South Forks.

CSF provides vehicular and passenger ferry service between Orient Point on the North Fork and New London, Connecticut. (Cmplt. ¶¶ 4, 11, 13). Passengers utilizing the CSF service who wish to proceed south to East Hampton from Orient Point may drive or take a bus or train 6 miles west to Greenport, take a ferry to Plaintiff Town of Shelter Island (15 minutes), drive (5 miles) to the southern end of the Town of Shelter Island and take a ferry to Sag Harbor (5

---

[1]This Court may take judicial notice of geography. <u>Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.</u>, 230 F.3d 549, 556 (2d Cir. 2000). All distances and travel times are approximate.

minutes), which straddles the border between the western end of East Hampton and the eastern end of the Town of Southampton. Shelter Island ferry service is provided by non-parties North Ferry Co. (Greenport - Shelter Island) and South Ferry Inc. (Shelter Island - Sag Harbor). (Cmplt. ¶¶ 17-19, 51; www.northferry.com; www.southferry.com).[2]

According to its web site, CSF (www.longislandferry.com) also provides daily morning shuttle bus service from its New London ferry terminal to the Foxwoods and Mohegan Sun gaming casinos and evening shuttle bus service from the casinos to the New London ferry terminal.

Travel between Connecticut and East Hampton can also be effected by vehicular ferry from Bridgeport, Connecticut to Port Jefferson, and driving to East Hampton (65.5 miles) or by rail, plane or bus from New York City. (www.easthampton.com/other/transportation.html). Between May and October, non-party Viking Ferry company provides non-vehicular ferry service between New London, Connecticut and Montauk. (www.vikingfleet.com).

Beginning in 1966 officials on the eastern end of Long Island recognized burgeoning transportation problems in the region. Myriad studies, reports and conferences confirmed what residents already knew: inadequate roads and an increasing population were creating escalating traffic congestion in the area, particularly in the summer months. (See, e.g., Cahn Aff., Exs. 9-14).

---

[2]This Court may take judicial notice of the contents of a website assuming, as in this case, its authenticity has not been challenged and "it is capable of accurate and ready determination." Fed. R. Evid. 201; see also Hotel Emples. & Rest. Emples. Union, Local 100 v. City of N.Y. Dep't of Parks & Rec., 311 F.3d 534, 549 (2d Cir. 2002); Boone v. Menifee, 387 F. Supp. 2d 338, 343 n. 4 (S.D.N.Y. 2005) (adopted in full at 2005 U.S. Dist. LEXIS 20005 (S.D.N.Y., Sep. 13, 2005)).

Studies contemplating the growth of the eastern end of Long Island and potential traffic and land use concerns were commissioned by different entities and agencies, including the New York State Department of Transportation, which issued the South Fork Transportation Study in 1986. (Cahn Aff., Ex. 12). Other studies followed, all seeking solutions to the area's transportation and traffic congestion issues. (See, e.g., Twomey Aff. ¶ 2; Cahn Aff., Ex. 14). A 1990 "Ferry Access Study" commissioned by the County cited Shoreham-Wading River as the only suitable site for additional ferry service from New England. (Bartha Aff. ¶ 2; Cahn Aff., Ex. 18). All of the studies recognized the increasing population, worsening traffic congestion and the lack of viable vehicular alternatives in light of the dearth of roads in the area which could accommodate, or be made to accommodate, the traffic load. In 1995, East Hampton commissioned the Amagansett Corridor Study. The draft study, published in 1997, recommended restricting both building and land use in East Hampton. (Cahn Aff., Ex. 15).

In August 1995, Catherine Lester, then a Councilwoman of East Hampton, issued a memorandum to the Town Board recommending the commission of a Town transportation plan and a moratorium on all ferry service and terminal applications pending the issuance of the proposed plan and consideration of the plan by the Board.[3] (Lester Aff. ¶ 2; Cahn Aff., Ex. 19).

Although CSF voiced its opposition to the proposed moratorium, it was nonetheless adopted on October 24, 1995. (Cahn. Aff., Exs. 22, 24). An engineering consulting firm, L.K. McLean Associates, was commissioned to draft the Comprehensive Plan which had been suggested by Councilwoman Lester in her August 1995 memorandum to the Board. The resulting Plan contained a "Transportation Element" which recommended against institution of

---

[3]The memorandum may have been triggered by news releases of CSF's institution of high-speed service without approval in the Town of Southold.

additional ferry service. (Di Biaisi Aff. ¶ 8; Cahn Aff., Ex. 17). Public hearings were held, culminating in the adoption of the "Transportation Element" of the Town's Comprehensive Plan on August 21, 1997. (Cahn Aff. ¶ 14, Exs. 16, 17).

Following the issuance of all necessary agency approvals, the Ferry Law was adopted, becoming operative on January 13, 1998. (Cahn Aff., Ex. 40).

The Ferry Law states, <u>inter alia</u>:

A.    Special Permit required.  No person shall construct, commence to use, or substantially expand a passenger ferry terminal, nor commence any passenger ferry service, without having first obtained a special permit pursuant to Article V hereof which specifically authorizes the proposed use and approves the onshore terminal facility to be employed.

B.    Vessel limitations.  No ferry which has more than two thousand (2,000) installed horsepower and the capability of travelling [sic] at a speed in excess of twenty (20) knots, nor any vehicle ferry of any description, shall dock at or otherwise make use of any passenger ferry terminal, or be allowed to dock at or make use of such facility, except in case of emergency.

This action was commenced on September 8, 2004.

III.    Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A fact is material "if it might affect the outcome of the suit under the governing law." <u>Holtz v. Rockefeller & Co.</u>, 258 F.3d 62, 69 (2d Cir. 2001).  An issue of fact is genuine only if a jury could reasonably find in favor of the nonmoving party based on that fact.  <u>Id.</u>  The moving party bears the initial burden of establishing the absence of any genuine issue of material fact, after which the burden shifts to the nonmoving party to establish the existence of a factual question that must be resolved at trial.  <u>Anderson v. Liberty Lobby, Inc.</u>,

477 U.S. 242, 256 (1986). The trial court is required to construe the evidence in the light most favorable to the nonmoving party, and draw all reasonable inferences in its favor. Id. at 252; Cifarelli v. Vill. of Babylon, 93 F.3d 47, 51 (2d Cir. 1996).

IV.     Analysis

    A.     Defendant's Rule 56.1 Statement

Plaintiffs have moved to strike Defendant's Rule 56.1 for alleged non-compliance with Local Rule 56.1. It is well-established that a District Court has "broad discretion to determine whether to overlook a party's failure to comply with local court rules." Holtz, 258 F.3d at 73. To this end, the District Court is authorized to "conduct an assiduous review of the record" in the absence of a proper Rule 56.1 Statement. Monahan v. New York City Dep't of Corrections, 214 F.3d 275, 292 (2d Cir. 2000). I have elected to undertake such a review and do not rely on Defendant's Rule 56.1 Statement. Therefore, Plaintiffs' challenge to Defendant's statement is denied as moot.

    B.     Standing

East Hampton has challenged each Plaintiff's standing to file the instant lawsuit.

        1.     Town Plaintiffs

Defendant claims that the Town Plaintiffs lack Article III standing, prudential standing and, as municipalities, standing to assert constitutional claims. The Town Plaintiffs claim that CSF's standing to bring a dormant Commerce Clause claim,[4] uncontested by Defendant, obviates the need for the Court to examine the merits of the Town Plaintiffs' standing. The

_____

[4]The Town Plaintiffs assert only a dormant Commerce Clause claim, and have not joined in CSF's Equal Protection or §1983 claim.

Town Plaintiffs further claim that, even without relying on CSF's standing, they possess the requisite standing.

The Town Plaintiffs argue that because CSF "has standing to assert each of the claims the Town Plaintiffs assert . . . this Court need not parse the sufficiency of Town Plaintiffs' standing independent from that of [CSF]." (Town Pl. Mem in Opp. at 11). However, the Town Plaintiffs have not identified any authority for the proposition that the Court should abstain, and I therefore decline to abstain from an examination of their standing.[5]

"At an irreducible constitutional minimum, Article III standing requires that the plaintiff have suffered an injury in fact -- an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." Connecticut v. Physicians Health Servs. of Conn., Inc., 287 F.3d 110, 116 (2d Cir. 2002) (quoting, in part, Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)) (internal quotations omitted). Furthermore, "Article III standing also requires that there be a causal connection between the injury and the conduct complained of and that it is likely that the injury will be redressed by a favorable decision." Physicians Health Servs. of Conn., Inc., 287 F.3d at 117, n. 7 (quotations omitted). The Town Plaintiffs are unable to show that their alleged injury (1) was caused by the Ferry Law, or (2) would likely be redressed by a favorable decision, and they therefore lack Article III standing.

---

[5] It is worth noting that, while some courts have refrained from a standing analysis once one plaintiff has established standing to assert a claim, there is at least some authority suggesting that this doctrine may be limited to appellate review. See Planned Parenthood of Idaho, Inc. v. Wasden, 376 F.3d 908, 918 (9th Cir. 2004) ("Where the legal issues on appeal are fairly raised by one plaintiff who had standing to bring the suit, the court need not consider the standing of the other plaintiffs.") (citations omitted); Houlton Citizens' Coalition v. Town of Houlton, 175 F.3d 178, 183 (1st Cir. 1999) ("It is a settled principle that when one of several co-parties (all of whom make similar arguments) has standing, an appellate court need not verify the independent standing of the others."); but see Arbor Hill Conc. Citizens Neigh. Assoc. v. County of Albany, 2003 U.S. Dist. LEXIS 11386, at *11-12 (N.D.N.Y. 2003).

The Town Plaintiffs complain of allegedly increased traffic that "places a burden on the economic resources of [the Town Plaintiffs], which are required to provide additional municipal services, including police and emergency services, highway maintenance and repair, and traffic control." (Cmplt. ¶ 31).[6] The Town Plaintiffs bear the burden of demonstrating standing. Lee v. Board of Governors of the Fed. Reserve Sys., 118 F.3d 905, 910 (2d Cir. 1997). However, their alleged injuries appear to have been created years before the implementation of the Ferry Law, by CSF's commencement of ferry service to and from the North Fork of Long Island. Thus, they cannot link their alleged injuries to the Ferry Law.

The Town Plaintiffs are also unable to show that a decision from this Court striking down the Ferry Law would ameliorate their alleged injuries. As the Supreme Court has explained,

> [w]hen the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it. When, however, as in this case, a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, much more is needed. In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction -- and perhaps on the response of others as well.

Lujan, 504 U.S. at 561-562. Since ferry operators rather than the Town Plaintiffs are the objects of the Ferry Law, and the Town Plaintiffs can show neither that the Ferry Law caused their alleged injury nor that these alleged injuries would be redressed by a favorable decision, they do not satisfy the Article III standing requirements. See also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 181 ( 2000) (requiring a plaintiff to show that "it is

---

[6]The Court need not and does not address whether the Town Plaintiffs' alleged injuries qualify as injuries-in-fact.

8

likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.") (citing <u>Lujan</u>, 504 U.S. at 560-61). The Town Plaintiffs' claims to the contrary are unsupported by the record before the Court, and the claims of the Town Plaintiffs are therefore dismissed for lack of standing.

### 2. Cross Sound Ferry

Defendant challenges CSF's standing to assert a claim under the Equal Protection clause of the federal constitution. CSF, a corporation that admittedly lacks constitutional rights, must demonstrate that it has *jus tertii* (third party) standing.

In order to establish *jus tertii* standing for a federal Equal Protection claim, a putative plaintiff must demonstrate that (1) it suffers an injury-in-fact, (2) it has a 'close' relationship with the parties on whose behalf it seeks to sue, and (3) there is a hindrance or hindrances that prevent the third party from suing directly. This analysis, particularly the second and third prongs, arises out of prudential, and not Article III concerns. Consequently, the Court has greater, albeit "not unbounded" discretion in this area. <u>L.A.M. Recovery, Inc. v. The Dep't of Cons. Affairs</u>, 377 F. Supp. 2d 429, 438 (S.D.N.Y. 2005). Each prong is addressed in turn.

### a. Injury-in-Fact

It is undisputed that CSF suffers an injury-in-fact. (Pl. Rep. Memo at 16; Def. Resp. Memo at 18-19).

### b. 'Close' Relationship

Defendant asserts that CSF's relationship with its passengers is not sufficiently 'close' to allow CSF to assert an Equal Protection claim on their behalf. The 'closeness' standard is satisfied when the "the relationship between the litigant and the third party may be such that the former is fully, or very nearly, as effective a proponent of the right as the latter." <u>Singleton v.</u>

<u>Wulff</u>, 428 U.S. 106, 115 (1976). Furthermore, the Supreme Court has held that it will be "quite forgiving" in applying, <u>inter alia</u>, the closeness requirement if a claim either (1) asserts First Amendment claims, or (2) "when enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of the third parties' rights." <u>Kowalski v. Tesmer</u>, 543 U.S. 125, __, 125 S. Ct. 564, 568 (2004) (emphasis in original). In the instant case, enforcement of the Ferry Law against CSF would, to the extent it is a violation[7], indirectly violate its passengers' rights, and it therefore will be reviewed under the "forgiving" <u>Kowalski</u> standard.

In <u>Craig v. Boren</u>, 429 U.S. 190 (1976), the Supreme Court allowed a beer vendor to assert an Equal Protection claim on behalf of unidentified males between ages 18-20 who were, unlike their female counterparts, prevented by operation of a state statute from purchasing 3.2% been.[8] The Court acknowledged the policy justifications for the usual prohibition on third party standing and stated that "insofar as the applicable constitutional questions have been and continue to be presented vigorously and cogently, the denial of jus tertii standing in deference to a direct class suit can serve no functional purpose." <u>Id.</u> at 194 (citations and quotations omitted). In support of this proposition, the Court cited Justice Blackmun in <u>Singleton</u>, 428 U.S. at 117-18 (1976), who explained that "it may be that a class could be assembled whose fluid membership always included some [males] with live claims. But if the assertion of the right is to be representative to such an extent anyway, there seems little loss in terms of effective advocacy

---

[7]The Court, at this stage, expresses no opinion on whether the Ferry Law actually violates CSF's passengers' rights.

[8]Plaintiffs in <u>Craig</u> had originally included a male between the age of 18 and 20. By the time the suit reached the Supreme Court, however, that plaintiff had "attained the age of 21 . . . [and] since only declaratory and injunctive relief against enforcement of the gender-based differential is sought, the controversy has been rendered moot as to [that individual]. The question thus arises whether . . . the licensed vendor of 3.2% beer . . . may rely upon the equal protection objections of males 18-20 years of age to establish her claim of unconstitutionality of the age-sex differential. We conclude that she may." <u>Craig</u>, 429 U.S. at 192-93.

from allowing its assertion by the present jus tertii champion." Id. (citations and quotations omitted). The Court also quoted Warth v. Seldin, 422 U.S. 490 (1975), and held that third party standing by a vendor on behalf of a vendee is appropriate when "enforcement of the challenged restriction against the vendor would result indirectly in the violation of third parties' rights." Warth, 422 U.S. at 510.

Defendant, citing Kowalski, argues that CSF and the passengers whose rights it seeks to assert do not have the requisite specific and identifiable relationship. However, the instant action, like Craig and unlike Kowalski, involves the "enforcement of the challenged restriction *against the litigant* [that] would result indirectly in the violation of the third parties' rights." Kowalski, 543 U.S. at __, 125 S. Ct. at 568 (2004) (emphasis in original).

While CSF does not bring suit on behalf of specific, identifiable passengers, the concerns that prompted the Supreme Court's decision in Kowalski are not present in the instant case,[9] and this failure is therefore not fatal. Thus, because the direct impact of enforcement of the Ferry Law against CSF could result indirectly in the violation of its passengers rights under the "forgiving" analysis, CSF's relationship with its passengers satisfies the 'closeness' requirement.

c.    Hindrance

Defendant also claims that the passengers on whose behalf CSF purports to sue do not face hindrances to bringing suit sufficient to merit *jus tertii* standing. However, as CSF argues, individual would-be ferry passengers face a sufficient disincentive to filing suit on their own behalf. As Chief Justice Rehnquist explained, "We have been quite forgiving with [the

_____

[9]As the Supreme Court explained in Kowalski, "[a] medical malpractice attorney could assert an abstract, generalized challenge to tort reform statutes by asserting the rights of some hypothetical malpractice victim (or victims) who might sue. An attorney specializing in Social Security cases could challenge the implementation of a new regulation by asserting the rights of some hypothetical claimant (or claimants). And so on." Id. at __, 529, n. 3 (quotations omitted).

hindrance] criteria in certain circumstances . . . ." Kowalski, 543 U.S. at __, 125 S. Ct. at 567-68. As described above, CSF and its passengers fall within one of the enumerated circumstances and therefore merit the "forgiving" analysis. As such, economic disincentives to suit in the instant case are a sufficient hindrance to allow CSF to assert Equal Protection claims on behalf of its passengers.

C.    Statute of Limitations

Defendant asserts that Plaintiff's challenge to the Ferry Law is barred by the three-year statute of limitations applied to § 1983 claims in New York. According to Defendant, Plaintiff was required to bring any challenge no later than three years after its passage in 1997. Furthermore, Defendant claims the continuing violation doctrine is disfavored in the Second Circuit and therefore does not salvage Plaintiff's allegedly untimely challenge.

The so-called 'continuing violation doctrine' allows a plaintiff to assert otherwise untimely claims where, inter alia, "there is a[n] express, openly espoused policy that is alleged" to be improper. Remigio v. Kelly, 04-cv-1877, 2005 U.S. Dist. LEXIS 16789, at *26 (S.D.N.Y., Aug. 12, 2005) (internal citation and quotation omitted) (collecting cases). While this doctrine is generally disfavored in the Second Circuit in cases involving "discrete acts" or discriminatory hiring, Levine v. McCabe, 357 F. Supp. 2d 608, 614-15 (E.D.N.Y. 2005); Jaghory v. New York State Dep't of Educ., 131 F.3d 326, 331 (2d Cir. 1997), this case involves neither discrete acts nor discriminatory hiring. CSF asserts a challenge to a law that continues to prevent it from establishing ferry service to and from East Hampton. This constitutes a continuing violation[10] solely for limitations purposes, and Plaintiff's claims are therefore timely.

---

[10]The Court does not suggest that the Ferry Law is a "violation" of any laws.

D.   Dormant Commerce Clause

The Commerce Clause of the United States Constitution grants Congress the authority to "regulate Commerce . . . among the several States . . . ." Article I, § 8, cl. 3.  The Supreme Court has long held that the clause contains both an affirmative grant of power and a "further, negative command, known as the dormant Commerce Clause . . . that prevents a State from . . . placing burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear." Am. Trucking Ass'ns v. Mich. PSC, 125 S. Ct. 2419, 2422 (2005) (quotations and citations omitted).  In application, a law can run afoul of the dormant Commerce Clause in two ways:

> First, a statute that clearly discriminates against interstate commerce in favor of intrastate commerce is virtually invalid per se and can survive only if the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism.  Second, if the statute does not discriminate against interstate commerce, it will nevertheless be invalidated under the Pike balancing test if it imposes a burden on interstate commerce incommensurate with the local benefits secured.

Grand River Enterprises Six Nations, Ltd. v. Pryor ("Grand River"), 425 F.3d 158, 168 (2d Cir. 2005) (quoting Freedom Holdings, Inc. v. Spitzer, 357 F.3d 205, 216 (2d Cir. 2004) (quotations omitted).[11]  Each is addressed in turn.

1.   Discrimination Against Interstate Commerce

A statute improperly discriminates against interstate commerce "only if it accords differential treatment to in-state and out-of-state economic interests that benefits the former and burdens the latter." Grand River, 425 F.3d at 168 (quoting Or. Waste Sys., Inc. v. Dep't of

---

[11]There exists a line of price-regulation cases in which the Supreme Court has struck down state laws that regulate commerce wholly outside the borders of the state. See, e.g., Healy v. Beer Inst., 491 U.S. 324 (1989).  These cases are inapplicable to the instant dispute and, in any event, the Ferry Law clearly does not regulate conduct wholly outside of New York.

13

Envtl. Quality, 511 U.S. 93, 99 (1994) (quotations omitted)). A plaintiff challenging a statute as clearly discriminatory must therefore "identify [an] in-state commercial interest that is favored, directly or indirectly, by the [law] at the expense of out-of-state competitors." Freedom Holdings, 357 F.3d at 218.

Plaintiff has failed to identify any in-state economic interest that is favored by the Ferry Law, but contends that the Ferry Law's "Findings and Objectives" are evidence of East Hampton's discriminatory intent. Although the "Findings and Objectives" note "the popularity of very large casinos established on the Connecticut mainland . . . which has greatly increased ferry traffic . . . ", (Ferry Law, Findings and Objectives, § I), the purpose of the Ferry Law is not to prohibit interstate travel, as Plaintiff claims. Rather, as stated in the very first sentence of the Findings and Objections, the Ferry Law was a response to "congestion on the Town's highways [that] has become an increasingly serious threat to public health and safety and to the economic vitality and general livability of the Town." (Id.) Thus, the purpose of the law was to protect against increased traffic and ensure the health, safety and economic vitality of East Hampton. This is confirmed by the fact that the Ferry Law bans all vehicular and high-speed ferries, and not just those serving Connecticut.

Plaintiff attempts to overcome the absence of a favored in-state economic interest by citing to "the City of Philadelphia line of cases." (Pl. Mem. in Opp. at 8). According to Plaintiff, these cases stand for the proposition that a local benefit, "such as East Hampton's alleged relief from traffic congestion, [may not] be achieved at the expense of blocking interstate commerce." (Id. at 9). Plaintiff misreads City of Philadelphia.

The plaintiffs in City of Philadelphia v. New Jersey, 437 U.S. 617 (1978), successfully challenged a New Jersey law that "prohibit[ed] the importation of most 'solid or liquid waste

14

which originated or was collected outside the territorial limits of the State . . . .'" Id. at 618

(quoting N.J. Stat. Ann. § 13:1I-10 (1978). According to Plaintiff, the Court held that the "*per se* [invalid] rule [applies] not only to laws motivated by a desire to protect local industries from out-of-state economic competition, but also to laws that purport to respond to legitimate local concerns by discriminating arbitrarily against interstate trade, for 'the evils of protectionism can reside in legislative means as well as legislative ends.'" (Pl. Mem. in Opp. at 8) (quoting, in part, City of Philadelphia, 437 U.S. at 626-27. Crucial to the Court's decision in City of Philadelphia, however, was the fact that the challenged law distinguished between in-state and out-of-state waste.

> New Jersey may [protect against environmental damage] by slowing the flow of
> *all* waste into the States' remaining landfills, even though interstate commerce
> may incidentally be affected. But whatever New Jersey's ultimate purpose, it
> may not be accomplished by discriminating against articles of commerce coming
> from outside the State unless there is some reason, apart from their origin, to treat
> them differently . . . . [However, t]here is no basis to distinguish out-of-state
> waste from domestic waste. If one is inherently harmful, so is the other. Yet
> New Jersey has banned the former while leaving its landfill sites open to the
> latter. The New Jersey law blocks the importation of waste in an obvious effort to
> saddle those outside the State with the entire burden of slowing the flow of refuse
> into New Jersey's remaining landfill sites. That legislative effort is clearly
> impermissible under the Commerce Clause of the Constitution.

City of Philadelphia, 437 U.S. 626-27, 629 (emphasis in original). Unlike the invalid restriction

in City of Philadelphia, however, the Ferry Law applies to both in and out-of-state ferries. Thus,

Plaintiff cannot demonstrate "discriminat[ion] against articles of commerce coming from outside

the State . . ." id. at 626-27, and the *per se* invalid test therefore does not apply.

2.    Pike Balancing Test

In Pike v. Bruce Church, Inc., 397 U.S. 137 (1970), the Supreme Court established a

balancing test "applicable to nondiscriminatory state legislation affecting interstate commerce."

Grand River, 425 F.3d at 169. As the Supreme Court explained in Pike, a nondiscriminatory law

> will be upheld unless the burden imposed on [interstate] commerce is clearly
> excessive in relation to the putative local benefits. If a legitimate local purpose is
> found, then the question becomes one of degree. And the extent of the burden
> that will be tolerated will of course depend on the nature of the local interest
> involved, and on whether it could be promoted as well with a lesser impact on
> interstate activities.

Pike, 397 U.S. at 142. As applied in the Second Circuit, this test entails a three part analysis:

"(1) the nature of the local benefits advanced by the statute; (2) the burden placed on interstate

commerce by the statute; and (3) whether the burden is clearly excessive when weighed against

these local benefits." Grand River, 425 F.3d at 169 (quotations omitted). Plaintiff's arguments

are largely devoted to the application of the *per se* invalid test. However, it does claim in

conclusory fashion that summary judgment is also inappropriate under the Pike analysis because

there are "genuine issues of fact on both sides of the scales of the Pike balancing test." (Pl.

Mem. in Opp. at 22).

The Ferry Law was clearly enacted to further a legitimate local purpose: the promotion

of the health and safety of East Hampton's residents. See Grand River, 425 F.3d at 169 (holding

"public health" to be a legitimate local benefit). As to the second prong, whether "there is a

qualitatively different burden on interstate commerce than on intrastate commerce," id. at 170,

Plaintiff "ha[s] failed to even allege" any such difference. Id. Furthermore, even to the extent

Plaintiff has alleged such a difference, it has offered no evidence in support of such an

allegation. Finally, in light of the other available travel alternatives available to and from East

16

Hampton, including ferry service, any burden placed on interstate commerce is minimal.

Therefore, any burden on interstate commerce is not "clearly excessive" when weighed against the local benefits, and Plaintiff's claims are without merit.

E.    Equal Protection Clause

CSF claims that the Ferry Law violates the Equal Protection Clause of the federal Constitution.[12] Specifically, CSF alleges that the Ferry Law improperly infringes upon its passengers' fundamental right to travel. Defendant argues that the Ferry Law only regulates one of many modes of transportation and therefore does not implicate the fundamental right to travel. CSF also claims that the Ferry Law discriminates against ferry operators and favors rail, road and air transporters. In response, Defendant argues that, under the applicable rational basis standard, the Ferry Law is rationally related to the legitimate state interest in regulating vehicular traffic.

1.    Standard of Review

The first step in evaluating the merits of an Equal Protection claim is to determine the level of review under which the challenged law will be evaluated. Attorney Gen. of New York v. Soto-Lopez, 476 U.S. 898, 906 (1986); Ramos v. Town of Vernon, 353 F.3d 171, 174 (2d Cir. 2003). "It is well established that where a law classifies by race, alienage, or national origin, and where a law classifies in such a way as to infringe constitutionally protected fundamental rights, heightened scrutiny under the Equal Protection Clause is required." Soto-Lopez, 476 U.S. at 906

---

[12]Count Two of Plaintiff's complaint, on which both parties have moved for summary judgment, alleges that the Ferry Law violates both the federal and New York State constitution. It is well-settled that the Equal Protection clause of both the federal and New York State constitutions are coextensive. Under 21, Catholic Home Bureau for Dependent Children v. New York, 65 N.Y.2d 344, 360 n. 6 (1985) ("We have held that the State constitutional equal protection clause (NY Const, art I, § 11) is no broader in coverage than the Federal provision."); Kraft v. Yeshiva Univ., 00-cv-4899, 2001 U.S. Dist. LEXIS 16152, at *9 (S.D.N.Y., Oct. 5, 2001).

(citations and quotations omitted); see also Ramos, 353 F.3d at 175 (citing Plyler v. Doe, 457 U.S. 202, 216-17 (1982)).

It is beyond dispute that the Fourteenth Amendment guarantees a fundamental right to travel. Soto-Lopez, 476 U.S. at 901; Saenz v. Roe, 526 U.S. 489, 498 (1999). As the Court explained in Soto-Lopez, "[a] state law implicates the right to travel when it actually deters such travel, when impeding travel is its primary objective, or when it uses any classification which serves to penalize the exercise of that right." Soto-Lopez, 476 U.S. at 903 (citations and quotations omitted). The Ferry Law will only be reviewed under strict scrutiny, then, if Plaintiff can demonstrate that it (1) actually deters travel, or (2) impedes travel as its primary objective, or (3) uses any classification which penalizes the exercise of that right. Id.

CSF argues that the Ferry Law runs afoul of each of these three tests. As to the first prong, Plaintiff argues that "[t]he Ferry Law 'actually deters' interstate travel by banning an entire mode of interstate transport (i.e., vehicular and high-speed passenger ferries) from East Hampton." (CSF Mem. at 12). Plaintiff's claim is without merit, and at odds with established caselaw. A statute does not interfere with the right to travel, as protected by the federal Constitution, unless it places an "unreasonabl[e] burden" on interstate travel. Saenz, 526 U.S. at 499. As the Fifth Circuit explained in Cramer v. Skinner, 931 F.2d 1020, 1031 (5th Cir. 1991), "travelers do not have a constitutional right to the most convenient form of travel. Minor restrictions on travel simply do not amount to the denial of a fundamental right that can be upheld only if the Government has a compelling justification." (citing Soto-Lopez, 476 U.S. at 903); see also Doe v. Moore, 410 F.3d 1337, 1348 (11th Cir. 2005) ("mere burdens on a person's ability to travel from state to state are not necessarily a violation of their right to travel.") (citing Saenz, 526 U.S. at 499).

18

The Ferry Law does not impede the constitutionally protected right to travel. The plaintiff in Cramer challenged a federal law that "prohibited airlines from offering single ticket interstate service from [Dallas area airport] Love Field except to the four states contiguous to Texas," id. at 1023, on the ground that, inter alia, it violated his fundamental right to travel. The Fifth Circuit rejected this claim and, in so doing, provided an overview of the scope of the fundamental right to travel. "[T]ravelers do not have a constitutional right to the most convenient form of travel. Minor restrictions on travel simply do not amount to the denial of a fundamental right . . . ." Id. at 1031. Although the Ferry Law may make travel to and from East Hampton less convenient, it does not infringe upon the fundamental right to travel.

As to the second test, Plaintiff contends that strict scrutiny is appropriate because the primary objective of the Ferry Law is to impede interstate travel. According to Plaintiff, the Ferry Law's Findings and Objectives, which state that the law was passed, in part, in response to "the popularity of very large casinos established on the Connecticut mainland . . . which has greatly increased ferry traffic . . . ", (Ferry Law, Findings and Objectives, § I), evinces Defendant's clear purpose to impede interstate travel between New York and Connecticut. However, the stated purpose of the law was to protect against increased traffic and ensure the health, safety and economic vitality of East Hampton; the casinos were additional proof of the need for concern.

Finally, as to the third test, any claim that the Ferry Law merits strict scrutiny because it employs a classification that penalizes the exercise of the fundamental right to travel is without merit. As explained above, the fundamental right to travel protected by the Constitution is not implicated in this case. Any classifications imposed by the Ferry Law, therefore, necessarily do not penalize the exercise of the fundamental right to travel.

19

Based upon the foregoing, the Ferry Law is therefore subject to review under a rational basis standard.

2.    Application

In order to survive rational basis review, a challenged statute need only be "rationally related to a legitimate state interest." <u>City of Cleburne v. Cleburne Living Ctr.</u>, 473 U.S. 432, 440 (1985). Under this analysis, "[i]f there is any reasonably conceivable state of facts that could provide a rational basis for believing" that the law is rationally related to a legitimate interest, then "it is not so arbitrary as to fail the constitutional test." <u>Zalewska v. County of Sullivan</u>, 316 F.3d 314, 322 (2d Cir. 2003) (quoting <u>Heller v. Doe</u>, 509 U.S. 312, 320 (1993)) (quotation marks omitted). To this end, the grounds on which the law is sustained need not be the grounds identified by the legislature in passing the law. <u>Jankowski-Burczyk v. INS</u>, 291 F.3d 172, 178 (2d Cir. 2002) (citing <u>FCC v. Beach Communications</u>, 508 U.S. 307, 320 (1993)). As the Second Circuit has explained,

> the government has no obligation to produce evidence to sustain the rationality of a statutory classification. We will assume that a statute is constitutional and the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record.

<u>Able v. United States</u>, 155 F.3d 628, 632 (2d Cir. 1998) (quotations and citations omitted).

Although CSF asserts in its Complaint that the Ferry Law distinguishes among various types of travel, and that these distinctions are "wholly arbitrary, without rational basis, and without any substantial or reasonable relationship to any legitimate governmental purpose . . ."

(Cmplt. ¶ 67),[13] Plaintiff fails to "negative every conceivable basis which might support the Ferry Law," Able, 155 F.3d at 632, and therefore has not met its burden.

It is well-established that a state or subdivision may pass laws to "protect the health, safety, and welfare of [its] citizens." Gonzales v. Raich, 125 S. Ct. 2195, 2213 (2005). Therefore, if there is "any reasonably conceivable state of facts that could provide a rational basis for believing" that the Ferry Law is rationally related to these goals, it will pass Constitutional muster. Zalewska, 316 F.3d at 322. Because there exists a rational basis for believing that a law restricting the flow of traffic is rationally related to protecting the health, safety and welfare of the citizens of East Hampton, the Court finds the Ferry Law does not violate the Equal Protection Clause.[14]

    F.    Police Power

        1.    Abuse of Police Power

"Both the New York Court of Appeals and the Supreme Court have made clear that a municipal zoning ordinance predicated on the State's delegation of the police power will be struck down only if the ordinance bears no substantial relation to the police power objective of promoting the public health, safety, morals or general welfare." A&P v. Town of E. Hampton, 997 F. Supp. 340, 347 (E.D.N.Y. 1998) (Wexler, J.) (citing, inter alia, Trustees of Union College v. Members of the Schenectady City Council, 91 N.Y.2d 161, 690 N.E.2d 862, 667 N.Y.S.2d

---

[13]CSF has generally limited its Equal Protection briefing to arguing in favor of strict scrutiny, and has provided only minimal briefing on the claim that the Ferry Law fails rational basis review.

[14]Plaintiff also argues that the Ferry Law is invalid under the exclusionary zoning test. This test is inapplicable to the instant situation, because the exclusionary zoning analysis applies only to residential zoning that is claimed to "exclude persons of low or moderate income from the zoning municipality." A&P, 997 F. Supp. at 349. Plaintiff has offered neither allegations nor evidence to this effect, and its claim based on the exclusionary zoning test is therefore dismissed.

978, 1997 WL 800676, *2 (1997)).  In application, "the validity of a zoning ordinance depends on the facts of the particular case and whether it is really designed to accomplish a legitimate public purpose." Berenson v. New Castle, 38 N.Y.2d 102, 107 (1975) (internal quotations and citations omitted).  The Ferry Law explicitly states, and Defendant argues that the Ferry Law is designed to accomplish the legitimate public purpose of protecting the health and safety of East Hampton's residents.  Plaintiff has offered no evidence to the contrary, and its police power claim is thus without merit.

2.    Town Law § 130

The Ferry Law was enacted in 1997.  At that time, New York Town Law § 130 authorized towns in the state of New York to enact laws

> [r]egulating the speed and regulating and restricting the operation of vessels and, in the counties of Westchester, Saratoga, Warren and Suffolk the size and horse power of inboard and outboard motors, while being operated or driven upon any waters within or bounding the town to a distance of fifteen hundred feet from the shore except that in Nassau and Suffolk counties, towns may regulate and restrict the speed and regulate and restrict the operation of vessels in all tidal waters upon lands within the geographic boundaries of such town and those tidal waters contiguous with the town to a distance of fifteen hundred feet from shore and not within any other town.

N.Y. Town Law § 130(17)(1)(a) (1997).  The towns of New York were also authorized to enact laws "[r]estricting and regulating the anchoring or mooring of vessels in any waters within or bounding the town to a distance of fifteen hundred feet from the shore." N.Y. Town Law § 130(17)(1)(b) (1997).  Defendant moves for summary judgment on the ground that this law, along with Town Law § 263, which authorizes laws "designed to lessen congestion in the streets," N.Y. Town Law § 263, provides it with the statutory authority to adopt the Ferry Law.  Plaintiff, in opposition, argues that the modification of § 130 in 2000 to specifically "prohibit"

personal watercraft and specialty prop-craft requires that, by negative implication, East Hampton lacked the authority to prohibit other types of vessels.[15]

Town Law § 130(17) granted East Hampton the authority to "regulat[e] and restrict[]" (1) the operation of vessels, (2) the size and horse power of inboard and outboard motors, (3) the speed of vessels, and (4) the anchoring and mooring of vessels. Town Law § 130(17)(1)(a)-(b) (1997). The restrictions contained in the Ferry Law are well within these boundaries. East Hampton has allowed, and continues to allow most types of vessels (including ferries) to dock at and use ferry terminals in East Hampton. It does not impose a blanket prohibition on all vessels,[16] but rather does exactly what § 130 authorizes: it regulates and restricts the operation, speed, horsepower and mooring of vessels.

Furthermore, Plaintiff's claim that East Hampton's authority to "regulat[e] and restrict[]" does not include the authority to "prohibit" is without merit. Webster's Third New International Dictionary, Unabridged, defines 'regulate' as, inter alia, "to fix the time, amount, degree, or rate of." Webster's Third New International Dictionary, Unabridged, pp. 1913 (2002). It defines 'restrict' as, inter alia, "to set bounds or limits to; to hold within bounds." Webster's Third New International Dictionary, Unabridged, pp. 1937 (2002). The Ferry Law regulates and restricts the types of vessels that are authorized to operate and dock in East Hampton. Furthermore, the provision on which Plaintiff relies was enacted in response to a specific problem, and did nothing to alter the towns' previously existing authority. See Memorandum of Senator Carl L. Marcellino (noting that the amendment, which was designed only to "clarify" the previously-

---

[15]Plaintiff's argument does not actually acknowledge the change to Town Law § 130(17) in 2000. Rather, it appears to interpret the current version of the law, which includes the language added in 2000. The substance of Plaintiff's argument, however, is unaffected by this apparent oversight.

[16]The Court need not and does not address whether such a prohibition would be proper.

23

enacted statute, was adopted because "[t]he numbers of these [personal watercraft and specialty prop-]crafts has grown exponentially in recent years, and the number of accidents has also risen dramatically. These crafts also raise environmental concerns in regard to water pollution and wildlife habitat damage and disruption.") This amendment did not rescind powers that had already been granted to the towns, and Plaintiff's police power claim is therefore without merit.[17]

## V.    Conclusion

For the reasons set forth above, Defendant's motion for summary judgment is GRANTED, and Plaintiffs' cross-motions for summary judgment and to strike Defendant's 56.1 Statement are DENIED. The Clerk of the Court is directed to close this case.


IT IS SO ORDERED


Sandra J. Feuerstein
United States District Judge

Dated: December 2 1, 2005
Central Islip, New York

---

[17]Because the Court finds authority for the Ferry Law under § 130, it need not and does not address whether § 263 would also authorize the Ferry Law.

To:

Patricia A. Finnegan
Town of Southold
Office of the Town Attorney
54375 Main Road
P.O. Box 1179
Southold, NY 11971-0959

Laury L. Dowd
Laury L. Dowd, Esq.
53095 Main Road
P.O. Box 1179
Southold, NY 11971

William W. Esseks
Esseks, Hefter & Angel
108 East Main Street
P.O. Box 279
Riverhead, NY 11901

Anthony D. Boccanfuso
Michael B. Gerrard
Arnold & Porter
399 Park Avenue
New York, NY 10022

Richard C. Cahn
Cahn & Cahn, LLP
445 Broadhollow Road
Suite 332
Melville, NY 11747-9034